783 So.2d 277 (2001)
M.R. & J.R., Appellants,
v.
DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellee.
Nos. 3D99-1268, 3D99-1880.
District Court of Appeal of Florida, Third District.
January 10, 2001.
Rehearing Denied March 26, 2001.
*278 Greer Davis Wallace, Miami, for appellant J.R.
Marc Anthony Douthit, Miami, Jason F. Joseph, for appellant M.R.
Robin H. Greene, Miami, for appellee.
Lauri Waldman Ross and Theresa L. Girten, Miami, for Guardian ad Litem Program.
Before JORGENSON, COPE and LEVY, JJ.
PER CURIAM.
In separate appeals, the parents of two minor children appeal from an Order adjudicating the children dependent. We affirm, as the trial court's findings are supported by a preponderance of the evidence.
The trial court conducted an adjudicatory hearing in which the following evidence was introduced: expert medical testimony and written medical reports; testimony from the Protective Investigator for the Department; expert testimony and reports from a licensed psychologist who examined the children and parents; and direct testimony from the parents and the children themselves. Based upon that evidence, the trial court found by a preponderance of the evidence that the children had been abused; that both the mother and father had failed to protect them; and that prospective abuse and neglect were likely to occur if the children remained with either or both parents. We affirm, finding that the trial court's findings are supported by a preponderance of the evidence. See In Re M.F.G. v. Department of Children & Families, 723 So.2d 290 (Fla. 3d DCA 1999) (holding that where the department establishes by a preponderance of the evidence that the child was abused and was likely to be neglected in the future, adjudication of dependency was proper); see also § 39.408, Fla.Stat. (1999).
In so holding, we decline the dissent's implied invitation to reweigh the evidence presented below since that is the province of the trial court. Instead, we simply note that there is more than substantial competent evidence to support the findings of the trial court.
Affirmed.
COPE, J., concurs.
JORGENSON, J., dissents.
*279 COPE, J. (concurring).
I join the majority opinion and write separately to address the dissent, which misreads the record. The case comes to us after an extensive evidentiary hearing, and the evidentiary record must be read in the light most favorable to the judgment.
This is a dependency proceeding, in which the Department of Children and Family Services must establish its case by a preponderance of the evidence. See In the Interest of M.F., 770 So.2d 1189 (Fla. 2000). The evidence is entirely sufficient to support the dependency adjudication.

I.
This case began when the grandmother of the three girls called the Department to say that the children's father (her own son) was sexually abusing the three daughters. The daughters were seventeen, twelve, and ten at the time of this telephone call.
The daughters were examined at the Rape Treatment Center. The physical examination was consistent with sexual intercourse in the case of all three daughters. With regard to the seventeen-year-old and the twelve-year-old, the examination results were consistent with there having been sexual intercourse on numerous occasions.
The physician testified that the examination results were consistent with penetration by penis or by more than one finger. The physician testified that this is not consistent with any accidental or inadvertent cause, but must be brought about by penetration by an object. The physician also testified that in the experience of the Rape Treatment Center, this is not something that children do to themselves, with the rare exception of the case of a child who has already been subjected to sexual abuse.
The daughters denied any present or past sexual activity and offered no explanation that would account for the results of the physical examination. In the initial interview the mother took the same position, and suggested that the grandmother may have caused the injuries in washing the girls. This suggestionwhich was totally impossible under the medical testimony was repeated by one of the daughters in a separate interview. The trial court could certainly draw the conclusion that the daughter had been coached to say this.
After the parents were told the results of the Rape Treatment Center examination, the parents went to the grandmother's house and had a confrontation with her. After the confrontation, the grandmother recanted. The trial court certainly could draw an adverse inference against the parents under these circumstances.
At trial the mother had a new theory about the cause of the daughters' Rape Treatment Center examination. The mother testified that the physical injuries to all three daughters were caused by the Rape Treatment Center doctors. The court rightly characterized this testimony as preposterous.
By agreement of the parties, the court interviewed the daughters. When one of the daughters was asked whether her mother had told her what to say, the daughter responded, "A little bit. She told me like, well, you know that your dad didn't do nothing to you." The Department investigator testified that in her initial interview of the children, one of the daughters expressed concern that her father would go to jail.
The father testified and denied any wrongful conduct with the daughters. He denied any knowledge of what may account for the results of the Rape Treatment Center examination.
*280 The court also heard the testimony of a psychologist who had interviewed the children. The psychologist gave a carefully qualified opinion which was to the effect that the psychological examination results were consistent with there having been sexual abuse, but that other causes were possible and that the court should give more weight to other evidence, including the medical evidence.
The trial court concluded that by a preponderance of the evidence the Department had established all three of the daughters were sexually abused and that the parents failed to protect them. The court said it could not find at this point by preponderance of the evidence that the father had committed the sexual abuse of the children although the evidence was that the father could be the perpetrator.

II.
The practical problem confronting the court in this case is whether the younger daughters can be returned to the parents.[1] While it is a serious matter to remove children from their home, it would be catastrophic to return them to a household where they will be sexually abused, or where the parents will not protect them from sexual abuse.
The evidence certainly points to the father as being the perpetrator. The mother and father both confronted the grandmother about her call to the Department, after which the grandmother recanted but the physical evidence is entirely consistent with what the grandmother said to begin with.
There is evidence of repeated coaching. The mother and one child initially told the investigators that the grandmother had caused the injuries by washing, which is not consistent with the medical evidence. At trial, one of the children told the judge that the mother wanted her to say that her father had not done anything to her.
The mother's testimony at trial consisted of the absurd story that the Rape Treatment Center itself caused the injuries to the daughters. One of the children revealed to the Department investigator that she was concerned that her father would go to jail. There is no evidence of anyone else who would have access to these children who could be responsible other than the father.
Experience in other cases shows that when a parent learns the results of a Rape Treatment Center examination like the one in this case, the parent will move heaven and earth to find out the truth about what happened. There was no such response by the parents in this case.
The only consistent thread in this case has been the parents' determination to protect the father from criminal charges. If it is assumed that the father is not the perpetrator, then the parents have shown no interest in identifying the perpetrator and taking steps to protect the children from the perpetrator.
The trial court took what it undoubtedly regarded as a cautious approach in this case. In essence the court ruled that there was a significant possibility that the father was the perpetrator but even if he is not, these parents simply cannot be relied on to protect the daughters.
It is not safe to return the daughters to the home. The trial court was entirely correct in its ruling.

III.
The dissenting opinion places special emphasis on the testimony of the psychologist that the result of the psychological *281 examination was consistent with there having been sexual abuse, but also could be consistent with there having been no sexual abuse. That is hardly a basis on which to overturn the trial court order. The psychologist was very specific that an adjudication in the case could not be based on the psychological report alone, and that other evidenceparticularly the medical evidenceshould be carefully considered. The psychological evidence in the case is reviewed by the trial court in one paragraph of the five-page dependency order, and plainly was not the dispositive or pivotal evidence in the case.
The dissent points out that no criminal charges have been filed against the father. That, too, is beside the point. The filing or failure to file criminal charges is immaterial. The question is whether the evidence actually brought forward at the dependency hearing is sufficient. It is.

IV.
The dependency adjudication in this case is fully supported by the evidence in the record, and I join in affirming the judgment.
JORGENSON, Judge, dissenting.
By its decision today, the court establishes a new evidentiary standard in dependency cases: "If we can't figure out what happened, Dad must've done it and Mom must've failed to stop it." The catastrophe suggested by the concurrence is not the possibility that the children will be returned to their home and family, but the failure of the trial court, and now this court, to do so. The sweeping assumptions made by the trial court and the majority today are shocking. An appellate court should carefully review an order of dependency, particularly where the State is seeking to terminate parental rights, to ensure that at least a scintilla of evidence supports that order. Notwithstanding the concurrence's suggestion that there is ample evidence to support an affirmance, a careful review of the record leads to the inescapable conclusion that in this case, there is NO evidence to support the order of dependency.
This is no ordinary dependency case. During the pendency of the appeal, the Department has notified this court that it intends to institute proceedings to terminate the mother and father's parental rights. The progressive and systematic destruction of this family, however well-intentioned in its inception, is not supported by any competent evidence, much less by the preponderance of the evidence. For that reason, I dissent. See In Re R.D.D., 518 So.2d 412, 415 (Fla. 2d DCA 1988) ("A trial court's findings of fact should not be disturbed unless there is a total lack of substantial evidence in support.").
My view of this case is startlingly different from that of the court. Contrary to the statement in the concurring opinion that this dissent "misreads the record," my conclusions are based upon a painstaking and deliberate review of the reports and the transcripts in this case.
The order of dependency and this court's affirmance of that order are built upon a psychological house of cards. The proceedings began with a complaint that the girls had been sexually abused by their father; that complaint was lodged by a disgruntled grandmother who later retracted her accusation.[2]
*282 The complaint was, as it should have been, treated seriously and investigated. The girls, ages ten and twelve at the time, were examined at Jackson Memorial Hospital's Rape Treatment Center and were found to have enlarged hymens and healed hymenal tears. (Appellee's Supp. T. at 108-109, 116.) The examining physician was certain that the tears were old and that they were not caused by the examination itself. (Id. at 109, 122.) There is no dispute that the medical testimony was accurate and uncontroverted: something had, in the past, penetrated the children's vaginas. The psychological expert also opined that although his findings were consistent with abuse that was being concealed, they were also "consistent with the possibility that no abuse ever occurred." (R. at 26; emphasis added.)
The girls have since that day vehemently denied that they had ever engaged in any sexual activity of any sort with anyone. They consistently denied that their father, or anyone else, had penetrated their vaginas in any way. The father consistently denied any sexual contact with his daughters. The mother consistently denied that the father had abused their daughters in any way, and also consistently rejected the medical conclusion that their daughters' vaginas had been penetrated by anyone or anything.
There is absolutely no evidence in the record that the father committed any acts of abuse against these children. No criminal charges were ever brought against him. In fact, in the order of adjudication of dependency, the trial court specifically ruled that "without further proof as to the identity of the perpetrator, the Court cannot find by a preponderance of the evidence that Father [sic] committed the sexual abuse of the children despite evidence that the father could be the perpetrator." (R. at 169; emphasis added.) Nevertheless, the children were adjudicated dependent as to the father because he had failed to protect them from whatever act had caused the hymenal stretching and tearing. The children were adjudicated dependent as to the mother because she also had failed to protect them from whatever had caused those medical findings. Furthermore, the court ruled that the mother's unflagging denial that her daughters had been sexually abused was "indicative of a level of denial that could continue to endanger these children because it indicates a failure to acknowledge or recognize clear evidence that the children were sexually abused." (R. at 167.)
In reaching these conclusions, the experts opined that the daughters had been coached by their mother to deny that their father had abused them. That opinion was based on the Department investigator's testimony that when questioned individually, the mother and two children gave "almost verbatim" responses. (T. Vol. I at 33.) However, the Investigator admitted that she took no notes of the words used by the girls at the interviews. (Id. at 63-64.) She gave conflicting testimony as to whether the mother or daughters, or all or any of them, had spoken through interpreters. (Id. at 60, 62, 75.) The Investigator nevertheless testified that it was "so obvious that we both were like, shocked" that the daughters had been coached. (Id. at 85-86.) The Investigator further stated that "I mean, in my notes we wrote `possibly children being coached' because it was so obvious." (Id.) That opinion, based upon one encounter with the children and their mother, was seized upon by all subsequent experts, and, with sufficient repetition by them, assumed the mantle of truth. The finding of "coaching" was one basis of the trial court's order, and is now one ground for this court's affirmance.
*283 Additionally, the reports and the adjudication of dependency relied heavily on the parents'particularly the mother'scontinued denials that any abuse had occurred, and the mother's attempts to explain the medical findings.[3] The denials were viewed as either a deliberate or unconscious attempt to avoid the "truth" that the hypothetical unproven abuse had occurred. This reasoning is at best, circular, and at worst, absurd. As noted by the examining psychologist, "the problem is of course that a finding that Jorge and Mercy [the parents] are capable of denial, does not necessarily imply that when they deny something they are using a defense mechanism. The alternative possibility is that it actually did not happen." (R. 41; emphasis added.) Despite that possibility, the psychologist concluded that "the allegations [of abuse] may be true" because of the Rape Treatment Center's findings, as it was his "understanding that the physical evidence in this case is more or less convincing." (R. at 41; emphasis added.) The psychologist interpreted crayon drawings the girls had made as raising suspicions that the girls had "something to hide." (R. at 42.) What they were "hiding," though, was not apparent from those drawings. (Id.)
In short, someone or something penetrated the daughters' vaginas. As the Rape Treatment Center physician explained, "I said it's a penetration, but we don't know what type of penetration." (Supp. T. at 6; emphasis added.) He clearly testified that at no point in his examination and report did he indicate that the girls had been sexually penetrated, or molested, or abused in any way. (Id. at 8-9.) Nevertheless, because there was, in the words of the expert and the trial court, no "plausible explanation" (R. at 42, 168) other than sexual abuse that would account for the medical evidence, the expert witnesses hypothesized, and the court found, that such posited sexual penetration and abuse indeed occurred. This court, in the concurring opinion, repeats the conclusory refrains of "sexual intercourse" and "sexual abuse" when in fact the only medical evidence is that vaginal penetration by something or someone, at some point in time, occurred. The experts further hesitatingly theorized that the father "could be the perpetrator." The court found that although the preponderance of the evidence did not establish that the father was the perpetrator, he nevertheless had failed to protect them from the hypothetical sexual activity or abuse. Because the mother refused to accept that hypothesis, the experts, the trial court, and this court have concluded that her denials indicated that she would fail to protect them from whatever danger had harmed them in the past.
The Department of Children and Families has a clear duty to investigate allegations of abuse. It is my view, however, that care should be taken to prevent the allegations from taking on a life of their own, and to proceed with extreme caution when the conclusions from the medical findings are, as here, equivocal.
The evidence is uncontroverted that until October 1997, when the children were *284 removed from the home, this was a loving, close-knit family, with no taint of abuse or neglect. For three years now, the children have lived in shelters and foster homes. Each girl testified at the adjudicatory hearing that the worst thing that had ever happened to her was being separated from her parents. This forced separation is the result of an investigation gone amuck, and opinions "formulated from testimony best described as psychobabble." Simms v. Department of Health & Rehab. Svcs., 641 So.2d 957, 963 (Fla. 3d DCA 1994) (Jorgenson, J., dissenting). Neither the opinion of the trial court nor the court's opinion today is grounded upon the standard of preponderance of the evidence. I would reunite this family.
NOTES
[1] The oldest daughter has become eighteen and is not subject to the dependency order.
[2] One of the daughters later explained that her grandmother was angry at the father for not loaning her money to go to Disney World with the rest of the family. She had, in the past, called the police when another son did not repay a $300.00 loan. (R. at 23.)
[3] The concurrence is correct in stating that at one point the mother tried to explain the findings by suggesting that the hymenal tears were caused by the Rape Treatment Center examination itself. She alternatively suggested that they were caused by vigorous personal hygiene while bathing. These explanations appear at worst ingenuous, or at least desperately naive. However, in light of the family's strong religious and cultural heritage, it is entirely possible that other explanations which may have implicated the daughters' own behavior were unacceptable to her. Her attempts to find a personally acceptable explanation for the evidence of penetration should not damn her.