795 So.2d 1043 (2001)
G.V., Appellant/Cross-Appellee,
v.
DEPARTMENT OF CHILDREN AND FAMILIES and The Guardian Ad Litem Program, Appellees/Cross-Appellants.
No. 3D00-1147.
District Court of Appeal of Florida, Third District.
September 19, 2001.
*1044 Steven Grossbard, for appellant/cross-appellee.
Robin Greene and Nancy Schleifer, Miami, for appellees/cross-appellants.
Before COPE, FLETCHER and SORONDO, JJ.
SORONDO, J.
G.V. (mother) appeals the lower court's order adjudicating her child, F.G., dependent as to her.

I. FACTS[1]
On September 29, 1997, the Department of Children and Families (Department) took F.G., a two-month old child at the time, into custody after receiving a report from Miami Children's Hospital that F.G. had suffered a fracture of the right femur, which the hospital characterized as a non-accidental injury consistent with child abuse. The case history related by F.G.'s father was that F.G. had fallen from his arms, and in an effort to break the child's fall, he had grabbed F.G. by the thigh, causing the femur fracture. The hospital also noted that F.G. had old healing fractures.
The Department petitioned the trial court for a detention order based on allegations of abuse and neglect by the parents,[2] which the court entered following a hearing on the matter.[3]
On January 12, 1998, the Department filed a petition to terminate the mother and father's parental rights. The day before the adjudicatory hearing, the father executed a voluntary surrender of his parental rights.[4] The case proceeded to be heard on the adjudication of dependency and termination of parental rights as to the mother only. The trial court heard testimony from the child protective investigator, the parents' former roommate, a service counselor for the Department, the termination of parental rights counselor serving as petitioner and custodian of records, proffer testimony from the Guardian Ad Litem representative, and testimony from medical experts and the mother.
The evidence revealed that the father had been baby-sitting F.G. when the injury to the femur occurred. The father took F.G. to the mother who was at work. After a series of delays, the parents sought the aid of a pediatrician, who advised them to take F.G. to Miami Children's Hospital for a more comprehensive examination. At the hospital, the staff conducted various procedures, including x-rays, a skeletal survey and a bone scan. The doctors interpreting the results of those procedures concluded that F.G. had a fracture of the right femur and several old healing fractures. The child protective investigator *1045 testified that both parents denied knowing how or when F.G. sustained the old fractures. When he questioned them about the femur fracture, the father stated he was nurturing F.G. when it happened.
The parents' former roommate, Petra Gonzalez, testified that the parents resided in her apartment from the time F.G. was over a month old until the femur fracture occurred. During that time, she did not see any injuries on F.G. The father took care of F.G while the mother worked. Ms. Gonzalez testified that F.G. cried a great deal, at times for one or two hours. At night, she frequently heard the parents use a vacuum cleaner while F.G. cried. On the morning of the incident, Ms. Gonzalez heard the father telling F.G. to shut up several times.
During the time they lived together, Ms. Gonzalez observed the parents smoking marijuana. She also saw that the father manipulated the mother. For instance, the father would keep the mother in their room when he did not wish for her to see other people in the apartment. The mother had confided in Ms. Gonzalez that the father used to break her belongings when he was angry with her. Ms. Gonzalez identified the father as the one who typically got physicalas when he slammed a door in anger. In contrast, the mother was mellow and would follow the father's orders.
According to Ms. Gonzalez, the parents were living together a few months before the adjudicatory hearing on LeJeune Road and 29 or 30 Street. She would see their cars parked together at night at that location.
The service counselor for the Department, Constance Nesbitt Wilson, testified that the mother and child bonded well together. She did not think it would be in the manifest best interest of F.G to terminate the mother's rights. However, she felt it was important that the mother get some services, including family counseling relating to domestic violence, to gain some insight as to what happened to F.G. Ms. Nesbitt-Wilson also thought the mother would need individual counseling. She believed that with services the mother could protect F.G.
Albert Linzner, the petitioner and custodian of records, testified that the Department took custody of F.G. based on doctors' findings that the child had a femur fracture and old healing fractures.
Based on the testimony and review of the file, it seemed to him that the mother should be provided with some necessary services, and in the future, there might be some reunification. He did not think it would be in the manifest best interest of F.G. to terminate the mother's rights.
The Guardian Ad Litem representative agreed with the positions taken by Ms. Nesbitt-Wilson and Mr. Linzner, and opined that it was in the manifest best interest of the child that the mother be given a case plan and that she be offered services to proceed with reunification, if feasible.[5]
The Department also called Dr. Walter Lambert, a pediatrician with the Child Protection Team. Dr. Lambert reviewed the x-ray reports, which included the acute right femur fracture and the skeletal survey.[6] In his opinion, the father's version *1046 of events was inconsistent with bio-mechanical forces necessary to break the femur, the strongest bone in the body.
As to the old healing fractures, Dr. Lambert testified that the x-ray reports revealed three definite fractures of different ages and episodes.[7] He removed all causes of metabolic illness because F.G. did not have any other fractures. Moreover, he noted that there was no mechanism of normal injury to explain the three fractures, including the hand fractures. In Dr. Lambert's opinion, the fractures were inflicted over a period of time. He estimated the oldest was about a month old, and indicated that the three definite fractures occurred on three separate injury episodes.
Defense counsel raised hearsay objections to Dr. Lambert's testimony, arguing that it was based on a review of the x-ray reports submitted by another doctor. The court overruled the objection, subject to a motion to strike.[8]
The defense presented testimony from the mother and Dr. Robert Elias, her radiologist expert. The mother testified that she believed the father had caused the fracture of the femur. She first became aware that F.G. had suffered an injury when she returned to work from lunch to find the father with F.G., who seemed to be in a great deal of pain. The father told the mother he had caused the injury on that same day, when he picked her up at her work. In response to how she felt about that, the mother stated that based on what everyone had told her, she did not want to take any risks. She was willing to protect F.G. from anyone, including the father.[9]
Once F.G. was examined at Miami Children's Hospital, the mother was told that the right femur had been fractured and that the injury was consistent with child abuse. By the time of the adjudicatory hearing, she believed the femur fracture was non-accidental.
At the hospital, the mother also learned that the x-rays revealed multiple fractures, which were consistent with child abuse. Since then, two radiologists have told the mother that there are no other fractures. The mother testified that she did not believe F.G. had suffered any other fractures.
As to her relationship with the father, the mother testified that the father calls her parents' house frequently, almost daily, to see how F.G. is doing. She and her father speak to him, and sometimes he speaks to F.G. She testified that there was no relationship between her and the father. She did not consider daily communication with the father a relationship per se. As to Ms. Gonzalez' testimony that the mother and father were living together after the incident, the mother stated that, "Well, I lived on 798 East 30th Street. She can't [sic] recognize my car, that's fine, that's where I lived. About the other car, I don't know."
The mother denied smoking marijuana, but said the father had used it in the past. She also denied being manipulated by him, and explained that it was her own choice to stay inside her room when people whom *1047 she did not know visited Ms. Gonzalez' apartment.
Since the incident, the mother indicated she had visited F.G. daily and had voluntarily completed parenting classes.[10]
Dr. Elias noted the femur fracture but did not see any other fractures, based on his review of the x-rays, which included a bone scan, a skeletal survey and a CAT scan of the brain and extremities.
At the conclusion of all the evidence, the court struck Dr. Lambert's expert testimony, finding it was inadequately supported by independent testimony or evidence, i.e., the radiologist who took the x-rays had not testified, nor had the experts who submitted the reports; furthermore, the x-rays had not been admitted into evidence.
Based on the remaining evidence introduced at trial, the court denied the petition to terminate the mother's parental rights, and adjudicated F.G. dependent as to the mother by a preponderance of the evidence. The trial court found that the father was responsible for the non-accidental injury, and that F.G. was abused by the father while in the custody of both the father and the mother. Furthermore, the court found that the mother acknowledged the father's responsibility for the child abuse. Based on the evidence and testimony presented, the trial court found that the mother was not to have further contact with the father, nor was she to permit or facilitate any contact between the father and F.G.

II. ANALYSIS

A. Main Appeal
The mother challenges the trial court's adjudication of dependency, contending that the trial court erred in its ruling because the Department failed to prove abuse, neglect or abandonment. We disagree.
In reviewing the trial court's order adjudicating F.G. dependent, we do not conduct a de novo review of the evidence or substitute our judgment for that of the trial court. See In re Adoption of Baby E.A.W., 658 So.2d 961, 967 (Fla. 1995); In re D.J.W., 764 So.2d 825, 826 (Fla. 2d DCA 2000). Instead, we will uphold the order under review if, upon the pleadings and evidence before the trial court, there is any theory or principle of law that would support the trial court's judgment. In re Adoption of Baby E.A.W., 658 So.2d at 967; In re D.J.W., 764 So.2d at 826. An adjudication will be upheld if the trial court's findings as to abuse, abandonment or neglect are supported by competent substantial evidence. D.D. v. Department of Children and Families, 773 So.2d 615, 617 (Fla. 5th DCA 2000).
Under section 39.01, Florida Statutes (1998), the definition of a dependent child includes one who has been abandoned, abused, or neglected by his or her parents, custodians or caregivers, or is at substantial risk of imminent harm from abandonment, abuse or neglect. § 39.01(14)(a), (f), Fla. Stat. In this case, the trial court adjudicated F.G. dependent on the basis of abuse and neglect. Abuse consists of "any willful act or threatened act that results in any physical, mental, or sexual injury or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired." § 39.01(2), Fla. Stat. Neglect occurs "when the parent ... permits a child to live in an environment when such ... environment causes the child's physical ... health to be significantly impaired or to be in danger of being significantly impaired." § 39.01(46), Fla. Stat. For the purpose of protective investigations, abuse and neglect of a child include the acts or omissions of the parent. *1048 § 39.01(2), (46), Fla. Stat. Abuse and neglect must be established by a preponderance of the evidence. § 39.507(1)(b), Fla. Stat. (1998); see M.R. v. Department of Children and Family Services, 783 So.2d 277, 278 (Fla. 3d DCA 2001); M.F.G. v. Department of Children and Families, 723 So.2d 290, 292 (Fla. 3d DCA 1998).
The record before us shows substantial competent evidence in support of the trial court's findings. The evidence establishes that F.G. lived in a tense environment, where he suffered physical injury consistent with child abuse. Based on the mother's own testimony, the father caused the femur fracture, which she ultimately acknowledged was non-accidental. However, the mother maintained she had no idea how or when F.G. would have sustained the old healing fractures; and, in fact, denied the existence of any such fractures. Meanwhile, the trial court heard testimony that F.G. cried incessantly, at times for one or two hours. At night, the parents would frequently use a vacuum cleaner while F.G. cried.
It was the father who cared for F.G. while the mother worked. The record indicates that the mother acquiesced to this arrangement, despite knowing of the father's substance abuse and his tendency to get physical when angered. While the mother denied being manipulated or controlled by the father, the trial court heard ample evidence to the contrary. Even after the mother learned that the father was responsible for F.G.'s non-accidental injury, she continued to have contact with the father; and contrary to a court order, she facilitated contact between the father and F.G. Thus, the mother has not only exposed F.G. to an environment that has harmed his physical health, but her actions and omissions belie her assurances that she would be willing and able to protect F.G. in the future.
Moreover, while the Department counselor, the petitioner, and the Guardian Ad Litem representative did not think it was in F.G.'s best interest to terminate the mother's parental rights, none of them thought the mother was prepared to be reunified with F.G. They all agreed she needed servicesto understand what had occurred to F.G. and to protect him, from the father and whoever else threatened to harm him.
This evidence establishes abuse and neglect, including prospective neglect, sufficient to support a finding of dependency, even in the absence of the medical testimony. We therefore affirm the trial court's adjudication of dependency as to the mother.

B. Cross-appeal
On cross-appeal, the Department and the Guardian Ad Litem argue that the trial court erred in excluding Dr. Lambert's expert testimony. Although we do not need to reach this issue in light of our decision in the main appeal, we feel compelled to address the matter because of the likelihood of recurrence.
Section 90.704, Florida Statutes (1998), provides:
The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
This Court has held that "the hearsay rule poses no obstacle to expert testimony premised, in part, ... upon tests, records, data, or opinions of another, where such information is of a type reasonably relied upon by experts in the field. This principle is particularly applicable where the *1049 expert testimony involves the diagnoses and opinions of medical doctors, predicated upon medical history, tests, and reports prepared by non-testifying witnesses." Bender v. State, 472 So.2d 1370, 1371 (Fla. 3d DCA 1985) (citations omitted). The reasonableness of the expert's reliance on such information may be questioned on cross-examination. Id. at 1372.
Here, Dr. Lambert based his testimony primarily on the x-ray reports that the pediatric radiologist at Miami Children's Hospital prepared when rendering his diagnosis. Dr. Lambert also considered the case history reported by the father. There is no suggestion in the record that these sources are not the type reasonably relied on by experts in this field to support their medical opinions. Accordingly, Dr. Lambert was entitled to rely on the reports in rendering his expert opinion, even though these were not in evidence. Bender, 472 So.2d at 1371-72; see Flores v. Miami-Dade County, 787 So.2d 955, 959-60 (Fla. 3d DCA 2001)(affirming decision that allowed expert to testify based in part on review of medical records, some of which were not admitted into evidence, where there was no contention that records were not the kind that an expert in the field would rely on in forming an opinion on the subject). The trial court erred in striking Dr. Lambert's testimony.
In conclusion, we find that the testimony offered by the non-medical witnesses is sufficient to support the trial court's adjudication of dependency as to the mother by a preponderance of the evidence, given the uncontroverted abuse inflicted on F.G., to which the father acceded.
We affirm the main appeal and reverse as to the cross-appeal.
NOTES
[1] Given the fact-intensive nature of our analysis, the facts of the case are set forth in detail.
[2] The petition also included allegations concerning the father's criminal background, which consisted, among other things, of auto theft, possession of marijuana and petit larceny, and an extensive delinquency record. The Department claimed risk of harm if the child remained in the parents' custody.
[3] After a positive home study, the court released F.G. to the temporary custody of his maternal grandparents. The court permitted the mother to have supervised visitations with F.G., but prohibited the father from visiting or contacting him.
[4] Thereafter, the trial court adjudicated F.G. dependent as to the father and entered a final judgment for termination of the father's parental rights. No appeal was taken from that judgment.
[5] The Guardian Ad Litem's Dependency Dispositional Report noted that the mother did not appear to fully understand what had happened to F.G., and recommended that she undergo a parenting skills program to learn how to treat children and respond to their needs, and a course therapy to enable her to recognize abuse and respond appropriately. The Guardian was concerned that the mother would allow the father to have contact with F.G. if given custody.
[6] Dr. Lambert did not examine F.G. nor did he review the x-rays or the bone scan reading.
[7] The x-ray reports submitted by the pediatric radiologist at Miami Children's Hospital noted healing fractures of the left third metacarpal (a hand bone fracture), and suggested there might be additional fractures.
[8] The court advised the parties that it would strike Dr. Lambert's testimony if a proper foundation was not laid and if the medical records upon which Dr. Lambert was relying to render his opinion were not admitted into evidence.
[9] The record indicates that the mother is not married to the father.
[10] The service counselor for the Department corroborated this information.