Wesley W. **KIRK** and Marjorie J. Kirk, Appellees,

v.

**UNITED STATES** of America, Appellant.

William Keith **COX** and Mary Sue Cox, Appellees,

v.

**UNITED STATES** of America, Appellant.

Mozelle **FREY**, and others in class, Appellees,

v.

**UNITED STATES** of America, Appellant.

Nos. 71–1111–71–1113.

United States Court of Appeals, Tenth Circuit.

Nov. 23, 1971.

Rehearing Denied Dec. 20, 1971.

unseaworthy. Usner v. Luckenbach Overseas Corporation, et al, [400 U.S. 494] 91 S.Ct. 514 [27 L.Ed.2d 562] (1971)."

Jacques B. Gelin, Atty., Dept. of Justice (Shiro Kashiwa, Asst. Atty. Gen., William R. Burkett, U. S. Atty., James M. Peters, Asst. U. S. Atty., Edmund B. Clark and Peter R. Steenland, Attys., Dept. of Justice, on the brief), for appellant.

Richard A. Procter, Oklahoma City, Okl., for appellees.

Before BREITENSTEIN, McWILLI-AMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

These consolidated appeals are from money judgments which were awarded by

the United States District Court for the Western District of Oklahoma, Grant v. United States, 326 F.Supp. 843, to the above named residents of Oklahoma City as a result of property damage from a series of high altitude flights carried out under the direction of the Federal Aviation Administration at supersonic speeds at high altitude. The tests were conducted pursuant to 49 U.S.C. § 1353 (b), which section authorizes the FAA to undertake or supervise development work and service testing in the interest of improving aircraft. These particular tests were for the purpose of assessing the effect of sonic booms on persons and building structures.

Prior to the commencement of the tests the FAA announced that it would pay for any damages caused by its sonic booms. In fact, the FAA set up a claims program through the Department of the Air Force under the Military Claims Act (10 U.S.C § 2733) for the purpose of processing claims flowing from sonic booms. Numerous of these claims were paid. Many others were determined to be invalid and were rejected.

A large number were filed in federal district court under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Involved in these was property damage, that is, cracking of plaster walls. The issue disputed in the district court and here as well was whether the damage was a proximate result of the sonic booms and, *secondly*, the correctness of the awards of damage. The district court resolved these issues favorably to the claimants against the government and this court sustained the findings. See United States v. Gravelle, 407 F.2d 964 (10th Cir. 1969).[1]

The cases which are before us on appeal were filed in court after the running of the two-year statute of limitations applicable to the Federal Tort Claims Act. Because of this fact the cases were considered under the Tucker Act, 28 U.S.C. § 1346(a) (2).[2] The trial court reasoned that Gravelle, *supra*, had not held that recovery under the Tort Claims Act was exclusive, and proceeded to determine that the plaintiffs had effective remedies under the Tucker Act on one of two alternative theories: either that of a taking (in violation of the Constitution) or a remedy growing out of a contract, express or implied.[3]

1. In *Gravelle* this court described the events out of which the present suit arose:

Beginning February 3, 1964 and continuing through July 30, 1964, controlled test flights of from one to eight were flown daily over Oklahoma City by aircraft flying at supersonic speeds and at altitudes of from 21,000 to 50,-000 feet. The general purpose of the tests was to gain information probing the feasibility of developing supersonic commercial aircraft and the particular purpose was to measure structural response to sonic booms as well as "determine the normal reaction of ground population over a significant period of time to sonic boom pressures. * * * " Eleven test houses in the Oklahoma City area, varying in age from new to 50 years old, were used in the program. Five of the test houses had instrumentation designed to measure the response of their various structural components to the sonic booms. Instruments were also set up in special stakes driven into the ground to measure and record move-

ment in the earth ("seismic response") caused by sonic booms. In addition, three measuring stations were established to measure the overpressure from the sonic booms. One of these measuring stations was located directly under the flight path the test aircraft were to take; the other two were located at five and ten miles distance from the flight path. 407 F.2d at 966.

2. § 1346(a) (2):

Any other civil action or claim against the United States, not exceeding $10,-000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

3. The trial court said in pertinent part:

It also seems just as clear that the Tucker Act, Section 1346(a) (2), does grant jurisdiction since none of these claims exceeds $10,000 and they are founded upon either the Constitution,

In construing this court's opinion in *Gravelle* as holding that relief was not limited to a remedy under the Tort Claims Act, the trial court pointed to an observation that the conduct of the government was willful. Liability under the Tort Claims Act arises only if the conduct of the agent of the government was negligent. Thus, according to the trial court's view, the relief could not have been granted under the Tort Claims Act, and hence it had to have been granted under the Tucker Act. We disagree with this. Read in its entire context, the opinion of this court did not expressly or by implication hold that the Tucker Act was available to claimants in the situations of the plaintiffs-appellees here. The litigation arose out of the Claims Act, and relief was granted under that Act. The characterization as to the willfulness of the conduct was obviously not intended to characterize the tort as willful as opposed to negligent, for there was not the slightest indication in the case of intent to inflict injury. The willfulness was to conduct tests and these in turn created a *risk* of damage. It is, however, important to note in *Gravelle* the applicability of the Federal Tort Claims Act was not questioned by the government and was not considered by the court. The sole issues were sufficiency of evidence to establish proximate cause and whether the damage was minimal or substantial. Therefore, since *Gravelle* does not even suggest that there can be relief under the Tucker Act, we are called on to determine for the first time (in this series of events) whether any facet of the Tucker Act justifies the granting of relief in the circumstances which are presented here.

The suits on behalf of Frey and Kirk were filed under both the Federal Tort Claims Act and the Tucker Act. The case on behalf of Cox was brought under the Tucker Act only. Similar suits were filed and were disposed of by Judge Bohanon who granted the government's motion to dismiss based upon his prior decision in Bennett v. United States, 266 F.Supp. 627 (W.D.Okl.1965), which held that the kind of injury here presented was not a taking in the constitutional sense compensable under the Tucker Act.

The government here moved to dismiss on the basis that the plaintiffs were barred from recovery under the Federal Tort Claims Act by the two-year statute of limitations and, further, that there could be no recovery under the Tucker Act since there had been no taking of property.

The government concedes that in order to win public acceptance of the testing program, the FAA announced at the outset that it would pay for damages caused by sonic booms and it repeated this announcement of policy in conjunction with the defense of an injunction case filed in state court by citizens claiming that they had no adequate remedy under the Federal Tort Claims Act. The mentioned injunction was granted, and subsequently the case was removed to the federal district court, where the injunction was vacated and the action was dismissed for lack of jurisdiction. This latter decision was reversed by this court in Coxsey v. Hallaby, 334 F.2d 286 (10th Cir. 1964). On remand the district court determined that the test program was duly authorized by law, was reasonable and did not deprive the complainants of due process of law and that an adequate remedy at

---

an Act of Congress or upon an express or implied contract with the United States and/or are for unliquidated damages in cases not sounding in tort. The Government had the obligation under the Constitution to pay just compensation. The damage to the property constituted a taking within the terms of the Constitution and it may rationally be said that the Government

did take that part of the property which it damaged. It appears also that tests were made under the authority of an Act of Congress authorizing the sonic boom tests and if the agreement of the Federal Aviation Authority to pay any damage is not an express contract it is a contract implied in fact. It constituted a promise to pay.

.

law was available precluding equitable relief. See Coxsey v. Hallaby, 231 F.Supp. 978 (W.D.Okl.1964).

The question presented then is whether a litigant claiming that his property was injured as a result of a series of high altitude tests at speeds in excess of the speed of sound producing sonic booms has a remedy under the Tucker Act either on the theory that there was a taking of his property by the government contrary to the Fifth Amendment of the Constitution of the United States or, in the alternative, whether the representation of government agents just prior to the commencement of the tests that it would pay damages resulting from injuries to property arising in connection with the mentioned activity constituted a contract, express or implied, giving rise to a claim under the Tucker Act.

## I

■ The facts of this case do not lend themselves to a conclusion that there was a taking of property in violation of the Fifth Amendment to the Constitution of the United States. The guiding lights in this determination are the decisions of the Supreme Court in United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). In the case at bar, giving full effect to the injuries incurred, it cannot be said that there was a *taking*, first, because of the isolated character of the injuries which were inflicted and, second, because of the absence of a permanent type of taking. An additional factor which militates against this being considered a taking is

the extremely high levels of the flights, whereby the planes were passing through air space which is in law navigable.

In *Causby* the flights were at low levels and were so repeated and permanent as to constitute the imposition of a servitude on the land; thus, there was an effective taking of property interests of the land owner farmers whose chickens were lost as a result of fright. Furthermore, the occupants of the house were deprived of sleep and suffered ill health as a result of the activity. The Court in *Causby* recognized that the owner of land has limited rights to control the air space above his property. The Court also recognized that there need not be an actual trespass in order for there to be a taking. The fact that the easement might not have been permanent was not regarded by the Court as a factor which detracted from its being a taking.

The Supreme Court's later decision in *Griggs* in essence applied the identical principle. Here the Court recognized the airport's need for adequate takeoff and landing space and held that where noise from aircraft landing and taking off rendered a home located at the end of the runway unbearable for residential use, there was a taking of an air easement over the property. The county which was responsible for designing the airport was held liable to property owners.

It is clear from a careful examination of *Causby* and of *Griggs* that the present judgment cannot be affirmed upon the basis that there was a constitutional taking in accordance with the first facet of the Tucker Act.[4]

---

4. In Batten v. United States, 306 F.2d 580 (10th Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502 (1963), this court ruled out a claim that there had been a taking arising from airplane noise and smoke adjacent to but not coming from planes flying directly above the property of the landowner. See also Bennett v. United States, 266 F.Supp. 627 (W.D.Okl.1965), wherein

Judge Bohanon, sitting in the same district as the trial judge in the instant case, resolved this contention of taking against the claimants. The fact that the flights had occurred six to nine miles above the ground level in navigable air space persuaded the court that there was no taking. See also Mosher v. City of Boulder, Colorado, 225 F.Supp. 32 (D.Colo.1964).

## II

■ ■ Next we consider whether there was an implied contract, and in this connection it is necessary that it be a contract implied in fact as opposed to one implied in law, commonly called a quasi-contract.[5] In order to have a contract implied in fact, there must have been a mutual agreement. Professor Williston has said:

> This * * * class consists of obligations arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words. Such transactions are true contracts and have some times been called contracts implied in fact. (1 Williston, Contracts, s. 3).

Professor Corbin has said that an implied contract includes those contracts actually intended and tacitly understood. 3 Corbin on Contracts § 563, 1960 Ed. Thus, then, there must be either circumstances or conduct from which it can be inferred that there was a meeting of the minds.[6]

■ This court has said that the elements of an express and implied contract are the same. The difference between them is one of proof. The express contract is proven by testimony showing the promise and the acceptance, whereas the implied contract is inferred from the acts of the parties and other circumstances showing an intent to contract. See Woodruff v. New State Ice Co., 197 F.2d 36 (10th Cir. 1952) (opinion by Murrah, J.).

The government contends that there was no contract and could be no contract because the agents of the government were not authorized to enter into contracts. However, it is unnecessary—in view of our conclusion that no valid contract was entered into—to determine whether there was such authority. Offhand, it would appear in view of the breadth of the program that such authority did exist.[7]

Unquestionably the government stated publicly that it would pay for damage caused by the test program and had there been circumstances manifesting acceptances and a detriment or forbearance suffered in response to the statements of the government, it might be possible to conclude that there was an enforceable contract. The closest that the evidence comes to something of this nature is the forbearance on the part of some of the people to proceed with injunctive actions. See Coxsey v. Hallaby, 334 F.2d 286 (10th Cir. 1964), wherein we determined that the issue of injunctive relief was genuine and not fictitious. Had these plaintiffs, then, refrained from instituting action as a result of the promise to pay there conceivably could be sufficient consideration to infer a valid contract. However, no facts appear from which such an inference may be drawn. In order to support a contract there must be an offer and an acceptance, together with a consideration. Here there is neither an acceptance nor is there shown to be consideration. None of the plaintiffs are shown to

---

5. See Knight Newspapers, Inc. v. United States, 395 F.2d 353, 357 (6th Cir. 1968): "Under the Tucker Act, Congress has waived sovereign immunity with respect to actions founded upon express or implied contract. However, numerous decisions have held that this waiver of sovereign immunity is limited to express contracts and contracts implied in fact and does not extend to contracts implied in law or founded upon equitable principles."
   See also Goodyear Tire & Rubber Co. v. United States, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575 (1926); Harley v. United States, 198 U.S. 229, 25 S.Ct. 634, 49 L.Ed. 1029 (1905); Northwest Publications, Inc. v. United States, 253 F.Supp. 828 (D.C.D.C., Judge Holtzoff 1966); Developments in the Law—Remedies Against the United States and its Officials, 70 Harv.L.Rev. 827, 884–887 (1957).

6. Baltimore & O. R. Co. v. United States, 261 U.S. 592, 598, 43 S.Ct. 425, 67 L.Ed. 816 (1923).

7. Federal Aviation Program, 49 U.S.C.A. § 1353; Transportation Act of October 15, 1966, 49 U.S.C.A. §§ 1655, 1657.

have relied on any statement or promise which the government made.[8]

So, therefore, the plaintiffs have not contended, and cannot contend, that they either had an understanding or were even lulled into a feeling of security whereby they did not file their claims within the two-year period required by law. The fact that the plaintiffs have now filed lawsuits does not constitute any acceptance of an offer on the part of the government. As we view it the government's conduct was no open ended offer in any event. It was merely an expression that it intended to pay actual damage suffered, following which it set up machinery for the purpose of processing the claims. It did not undertake to entertain them and pay them indefinitely and long after the fact.

Apart, then, from the Tort Claims Act which has, as previously noted, a two-year limitation statute, and the Tucker Act which as has been shown does not embrace the damage in question, the government is immune from suit, and it is not possible to fashion a remedy which will permit the plaintiffs to prevail.

Accordingly, the claims are invalid and the judgments must be reversed with directions to vacate the judgments in favor of the plaintiffs-appellees. It is directed that the causes of action be dismissed.

---

8. Perhaps generally illustrative of the type of testimony offered is that of Mrs. Inez Vanderlick, found at pp. 229–230 of the Appendix:

Q. Will you state whether or not this was reported to the FAA officials?
A. Yes, it was. There were letters sent to Washington and I received two letters back from them and they were turned in to an attorney and in the meantime I haven't been able to recover them.
Q. But you did make a complaint?
A. Yes, we did.
Q. Did someone from the Air Force or FAA come out to look at your home?
A. No. They didn't come out to the house. It was a letter you received from the government. You were supposed to send the estimates in. They were done by Billings Lumber Company and Francis T. Smith, and I don't believe either one of them are any more operative.
Q. Did someone from the government come out and look at your house?
A. I don't remember that. I believe there were.

No effort was made to determine why Mrs. Vanderlick did not follow up the initial contact. The excerpt here quoted is the entire testimony given by this plaintiff having to do with her relations with the Government in any wise; it is, if anything, more comprehensive than that of the other plaintiffs.