# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-1086

_____

SDI QUARRY a/k/a Atlantic Civil,
Inc.,

    Appellant,

    v.

GATEWAY ESTATES PARK
CONDOMINIUM ASSOCIATION,

    Appellee.

_____

On appeal from an order of the Division of Administrative
Hearings.
John G. Van Laningham, Administrative Law Judge.

June 22, 2018

JAY, J.

Appellant seeks review of a final administrative order awarding compensatory damages to Appellee on the ground that blasting activities at Appellant's quarry caused damage to the shore of Appellee's lake. Appellant asserts that the order should be reversed because (1) Appellee's petition for damages was time-barred under section 552.40(1), Florida Statutes (2015); and (2) Appellee failed to prove that Appellant's blasting activities damaged Appellee's lake. We disagree and affirm.

## I.

The administrative law judge's final order outlined the relevant facts of this case, many of which are undisputed and are recounted here. Specifically, Appellee is a condominium association that oversees a mobile home community consisting of 220 mobile homes and two vacant lots. Appellee holds title to a number of common elements, including a man-made lake—the South Lake—that was excavated sometime before 1975 when Appellee was organized.

In 2005, Appellant began blasting at three mines near the South Lake, the closest being located approximately 7000 feet from Appellee's property. This blasting continued without significant interruption from that time. Appellant performed twenty-five blasts between July 1, 2015, and October 17, 2016. Based on this figure, the administrative law judge drew the reasonable inference that the number of historical blasts affecting Appellee's property was in the range of 200 to 250.

In 2011, about five or six years after Appellee began its blasting activities, the shore of the South Lake began to destabilize, and saturated soil at the edge of the lake began to slough and slump into the water. This opened up fissures in the slope, which undermined the upward bank. In time, holes appeared in the bank, and pieces of the once level surface fell off, resulting in a narrowing of the horizontal area from roughly five feet to about a foot and a half. Residents observed the ground falling into the water in close temporal proximity to the blasting.

In late 2014 or early 2015, Appellee retained James McNew, the president and owner of a consulting business called Upper Keys Consulting, to give recommendations concerning restoration of the lake bank. On July 18, 2015, Upper Keys Consulting prepared a proposal in the amount of $840,000.00 for restoring the shore of the South Lake and installing preventive devices to protect the shoreline against erosion from further blasting.

On February 22, 2016, Appellee filed a petition pursuant to the Florida Construction Materials Mining Activities Administrative Recovery Act, alleging that Appellant had caused damage to the South Lake through the use of explosives in

2

connection with construction materials mining. Appellee subsequently moved to amend the petition to allege that it was seeking damages pursuant to the proposal from Upper Keys Consulting dated July 18, 2015. Appellant opposed the motion on the ground that the alleged damages were based on an estimate prepared more than 180 days before the filing of the original petition, rendering the petition untimely under section 552.40(1), which required the petition to be filed within 180 days "after the occurrence of the alleged damage." The administrative law judge granted the motion to amend without prejudice to Appellant's right to present evidence at the final hearing that the amended petition was untimely.

At the final hearing, the administrative law judge addressed Appellant's motion to exclude Appellee's proposed expert, James McNew, on the ground that he was not competent to testify because he had no training or significant education in seismology, geotechnical engineering, or geology, other than one class taken in college in the early 1970s. The administrative law judge preliminarily denied the motion without prejudice to revisiting the issue when McNew was called as a witness.

Over Appellant's renewed objection, McNew was allowed to testify as an expert on causation. During direct examination, McNew stated that he consulted extensively with his colleague, Jack Altoff; that they produced a set of notes based on their conversations and extensive research of the literature; and that these conversations formed the basis of his opinion as to the causes of the slope stability failures around the lake. The administrative law judge allowed McNew to testify despite Appellant's objection that McNew "admitted that some of his opinion was going to be based on what another engineer told him."

McNew opined that vibrations from Appellant's blasting caused the problems at Appellee's lake. Specifically, he explained that these vibrations acted upon the soft layer of silt atop the shore and bank of the South Lake, causing the liquefaction of this saturated soil extending up to eight feet beneath the surface. This led to the compaction of the loose, wet soil around the edges of the lake, opening up cracks and holes and weakening the slope, which began to erode and fail. McNew conceded that there were no legal

standards in Florida or elsewhere establishing thresholds above which lakeshore slope instability would be expected under the stress of blast-related vibrations. In formulating his opinion, McNew stated that he used Transit Authority Guidelines rather than mining guidelines because the transit guidelines provided a more realistic standard where the damages were not to buildings. McNew also ruled out other possible causes such as earthquakes or heavy truck hauling near the lake.

During Appellant's case, Appellant presented expert testimony from two Florida-licensed professional engineers, Steven Black and Eric Stern, who opined that erosion of the lakeshore was caused by the action of wind, waves, and rainwater percolating down and through the ground and pulling the silt from the bank. Both witnesses concluded that Appellant's blasting activities were not close enough to Appellee's property to impart sufficient energy to affect the soil around the South Lake. Black also ruled out heavy truck traffic as a cause, but conceded that heavy truck traffic could affect the silt layer of a lakeshore over a continuous period of time.

Appellant also presented expert testimony from Jeffrey Straw, who opined that soil consolidation would not occur at the "peak particle velocities" or PPV levels likely to have occurred at the lakeshore as a result of Appellant's blasting. Straw disagreed with NcNew's opinion that mining guidelines were not applicable in this case.

In his final order, the administrative law judge found James McNew's opinion on causation to be more persuasive than the competing view offered by Appellant's experts. In doing so, he noted that Steven Black's categorical opinion that blasting could not be a cause of the damage to Appellee's lake was undercut by his concession that heavy truck traffic could affect the silt layer of a lakeshore over a continuous period of time. The administrative law judge also found that the circumstantial evidence supported McNew's opinion. Specifically, he noted that "the South Lake had existed for at least 35 years without experiencing the deterioration of the shore and bank that became noticeable within just five or six years after the start of the blasting, and which worsened over time as the blasting has continued." He also noted "the persuasive

4

evidence that visible damage occurs in the wake of individual blasts."

Although the administrative law judge credited Steven Black's testimony to the extent it supported a finding that erosion from wind, wave, and rainwater was a natural cause of some of the bank erosion at the South Lake, he found that Appellant's blasting combined with natural forces and constituted a legal cause of the claimed property damage. He also accepted Jeff Straw's testimony concerning the PPV levels likely to have occurred at the lakeshore as a result of Appellant's blasting, but rejected Straw's opinion that soil consolidation would not occur at those levels, concluding that this testimony was unpersuasive because Straw merely conveyed the opinions of the authors of scientific literature that Straw had read; authoritative literature was supposed to be used on cross-examination, not to bolster Straw's opinion testimony; and Straw's testimony was inconsistent with Black's testimony that ground-borne vibration from heavy trucks could cause soil erosion at the lakeshore.

Finding that blasting was an ultra-hazardous activity for which strict liability was imposed, the administrative law judge concluded that Appellee was not required to prove that Appellant was negligent or that Appellant's blasting was the sole cause of Appellee's damage. He awarded $840,000.00 in damages as requested by Appellee based on the proposal from Upper Keys Consulting dated July 18, 2015, to restore and protect the shoreline against erosion from further basting. He rejected Appellant's claim that Appellee's petition was untimely, explaining that "as a matter of fact, the property damage at issue is present and continuing; the harm to the lakeshore is cumulative, indivisible, and inseparable." This appeal followed.

## II.

In 2003, the Florida Legislature enacted sections 552.32-552.44, Florida Statutes, collectively entitled the Florida Construction Materials Mining Activities Administrative Recovery Act. Ch. 2003-62, Laws of Fla. Section 552.36(1), Florida Statutes (2015), provides that "[t]he Division of Administrative Hearings has exclusive jurisdiction over all claims for damages to real or personal property caused by the use of explosives in connection

5

with construction materials mining activities." In addition, section 552.40(1), Florida Statutes (2015), provides that "[a] person may initiate an administrative proceeding to recover damages resulting from the use of explosives in connection with construction materials mining activities by filing a petition with the Division of Administrative Hearings . . . within 180 days after the occurrence of the alleged damage." Section 552.40(7) further provides that "[i]f the administrative law judge finds that the preponderance of the evidence presented demonstrates that the petitioner's damages were caused by the respondent's use of explosives, the administrative law judge shall set forth in a final order precise findings as to the damages attributable to the respondent and shall direct the respondent to pay damages in an amount supported by the preponderance of the evidence presented within 30 days after the final order is issued, unless the matter is appealed in accordance with s. 552.42."

## A.

Initially, Appellant claims that the administrative law judge erred in awarding damages to Appellee pursuant to section 552.40 because Appellee's petition was not filed "within 180 days after the occurrence of the alleged damage." Specifically, Appellant notes that Appellee filed its petition on February 22, 2016, seeking damages of $840,000.00 based on the written proposal dated July 18, 2015. However, the administrative law judge rejected Appellant's claim that the petition was time-barred concluding that "the property damage at issue is present and continuing; the harm to the lakeshore is cumulative, indivisible, and inseparable." In a continuing tort action, the statute of limitations runs from the time of the last tortious act. *Millender v. State, Dep't of Transp.*, 774 So. 2d 767, 769 (Fla. 1st DCA 2000).

Although no Florida case law has addressed this precise issue, other jurisdictions have recognized that repeated blasting activities can constitute the continuing tort of trespass. *See Haynie v. Howmedica Osteonics Corp.,* 137 F. Supp. 2d 1292, 1294 n.5 (S.D. Ala. 2000); *Oswald v. Metro. Life Ins. Co.*, 968 F. Supp. 639, 645-46 (M.D. Ala. 1997); *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220-21 (Ala. 1983); *Donaldson v. Amerikohl Mining, Inc.*, No. 1892 WDA 2014, 2015 WL 3938721 (Pa. Super. Ct June 9, 2015). The

6

administrative law judge found that Appellant performed twenty-five blasts between July 1, 2015, and October 17, 2016, and drew the reasonable inference that the number of historical blasts affecting Appellee's property was in the range of 200 to 250. Furthermore, Appellant sought damages to repair and restore the lakeshore and to abate future erosion of the lakeshore. These constitute temporary damages, which are properly recovered in a continuing tort action for trespass. *See Town of Miami Springs v. Lawrence*, 102 So. 2d 143, 146 (Fla. 1958); *Baker v. Hickman*, 969 So. 2d 441, 443 (Fla. 5th DCA 2007); *Carlton v. Germany Hammock Groves*, 803 So. 2d 852, 856 (Fla. 4th DCA 2002); *Kulpinski v. City of Tarpon Springs*, 473 So. 2d 813 (Fla. 2d DCA 1985); *see also Bisque Assocs. of Fla., Inc. v. Towers of Quayside No. 2 Condo. Ass'n, Inc.*, 639 So. 2d 997, 999 (Fla. 3d DCA 1994) (distinguishing between permanent damages, which are measured by diminution in the value of property, and temporary damages, which are measured by the cost of repairing or restoring the property to its original condition). Based on the above, we conclude that Appellee alleged a continuing tort such that each blast performed by Appellant gave rise to a new cause of action for which successive actions for damages might be brought.

Even if Appellee alleged a continuing tort, Appellant argues that Appellee can only recover damages from blasting activities that occurred less than 180 days before the filing of Appellee's petition. Because Appellee sought damages based on a written proposal dated July 18, 2015, Appellant asserts that Appellee sought damages for blasting activities occurring more than 180 days before the filing of Appellee's petition, which were time barred by section 552.40(1). However, the administrative law judge awarded $840,000.00 based on the written proposal "for restoring the shore of the South Lake and installing preventative devices to protect the shoreline against erosion from future blasting." The one-page proposal does not break down the cost of restoring the lake to its original condition—which could be time-barred—and the cost of installing preventive devices to protect the shoreline against erosion from future blasting—which would not be time-barred. Testimony at the final hearing did not break down these costs in further detail.

7

Furthermore, Appellant has not established that damages for restoration of the lake are entirely untimely. James McNew testified at the final hearing that his proposal was current as of the date of the final hearing; Appellee presented testimony that the lakeshore continued to deteriorate after Appellant's blasting activities in 2016, which fell within the 180-day limitations period; and the administrative law judge found that "[t]he stability of the slope has continued to worsen, and, as of the final hearing, the deterioration of the lakeshore, like the blasting, was ongoing." To the extent that a portion of the damage award might be time-barred, Appellant has failed to meet its burden of showing what portion of the award was barred by the statute of limitations. *See Town of Miami Springs*, 102 So. 2d at 146 (holding that the burden is on the pleader to prove the defense of the statute of limitations); *State, Dept. of Envtl. Prot. v. Fleet Credit Corp.*, 691 So. 2d 512, 513 (Fla. 4th DCA 1997) ("Fleet's failure to controvert this evidence precludes its argument that the statute of limitations bars the instant action, as Fleet must carry the burden of proving a statute of limitations defense."); *see also Hanano v. Petrou*, 683 So. 2d 637, 639 (Fla. 1st DCA 1996).

B.

Assuming that Appellee's petition was not untimely, Appellant claims that Appellee failed to prove that Appellant's blasting activities damaged Appellee's lake. In doing so, Appellant claims that James McNew should not have been accepted as an expert under the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which was adopted when section 90.702, Florida Statutes, was amended in 2013. Ch. 2013-107, § 1, Laws of Fla. Although the Florida Supreme Court declined to adopt this amendment to the extent it was procedural in *In re Amendments to Florida Evidence Code*, 210 So. 3d 1231 (Fla. 2017), the amendment would still apply in administrative proceedings under Chapter 120, Florida Statutes, which are not governed by rules of procedure promulgated by the Florida Supreme Court. *See* § 120.54(5)(a)1., Fla. Stat. (2016) (providing that the uniform rules adopted by the Administration Commission shall be the rules of procedure for each agency subject to Chapter 120). However, even though the *Daubert* standard would apply, Appellant's claim is not preserved for appeal because Appellant

never raised a *Daubert* objection or requested a *Daubert* hearing below. *See Rojas v. Rodriguez*, 185 So. 3d 710 (Fla. 3d DCA 2016); *Booker v. Sumter Cty. Sheriff's Office/N. Am. Risk Servs.*, 166 So. 3d 189, 192-93 (Fla. 1st DCA 2015). Accordingly, we cannot address Appellant's legal challenge to McNew's opinion to the extent Appellant alleges a flawed scientific foundation or methodology.

In its motion to exclude McNew's testimony, Appellant simply claimed that although McNew had a bachelor's degree in mechanical engineering in 1972, he was neither trained nor experienced in the fields of seismology, geotechnical engineering, or geology, which was necessary for the witness to express an opinion on the causal relationship between Appellant's blasting activities and Appellee's alleged damages. Appellant repeated this claim during the final hearing without further elaboration. The administrative law judge denied Appellant's motion and addressed the issue in his final order as follows:

> Although Mr. McNew is not licensed as a professional engineer, he holds a bachelor's degree in mechanical engineering, awarded in 1972, and during the course of a 50-plus-year career has been involved as a consultant or project manager on a number of marine projects, including the construction of 27 bridges in South Florida, all of which had earthwork abutments and adjoining bodies of water. Some of the projects Mr. McNew supervised involved drilling and blasting operations. As a result, Mr. McNew has acquired specialized knowledge relating to the use of explosives in and around saturated and submerged soils from long practical experience, which in addition to his formal education and training qualified him to testify as an expert on causation in this case.

Based on these findings—which are supported by competent substantial evidence—the administrative law judge did not abuse his discretion in finding McNew qualified to testify as an expert on causation in this case. *See Chavez v. State*, 12 So. 3d 199, 205 (Fla. 2009) ("A witness may be qualified as an expert through specialized knowledge, training, or education, which is not limited to academic, scientific, or technical knowledge. An expert witness may acquire

this specialized knowledge through an occupation or business or frequent interaction with the subject matter."); *Brooks v. State*, 762 So. 2d 879, 892 (Fla. 2000) ("It is within the trial court's discretion to determine a witness's qualifications to express an opinion as an expert, and the trial court's determination in this regard will not be reversed absent a clear showing of error.").

Appellant also objected below to McNew's testimony on the ground that McNew "admitted that some of his opinion is going to be based on what another engineer told him." Specifically, McNew testified that he consulted extensively with his colleague, Jack Altoff; that they produced a set of notes based on their conversations and extensive research of the literature; and that these conversations formed the basis of his opinion of the causes of the slope stability failures around the lake. In *Linn v. Fossum*, 894 So. 2d 974 (Fla. 1st DCA 2004), this court held that the trial court did not err in admitting the expert opinion testimony of a urologist, who testified that she consulted with other urologists in formulating her opinion, noting that "[i]t is proper for an expert witness to consult with other experts in the same field in formulating an opinion." *Id.* at 977. Although the Florida Supreme Court quashed this decision, it did so on the narrower ground that the trial court erred in allowing an expert to testify on direct examination that she consulted with colleagues, approving the Fourth District's decision in *Schwartz v. State*, 695 So. 2d 452 (Fla. 4th DCA 1997). *Linn v. Fossum*, 946 So. 2d 1032 (Fla. 2006). In *Schwartz*, the Fourth District held that "*while there was nothing improper about Dr. Burton consulting with other experts in his field*, he should not have been allowed to testify that he did so on direct examination." 695 So. 2d at 455 (emphasis added). Accordingly, while it may have been potentially improper for McNew to testify on direct examination that he consulted with a colleague in arriving at his opinion, McNew's consultation with a colleague was not a basis for excluding McNew's testimony in its entirety. *See Schoenwetter v. State*, 931 So. 2d 857, 870-71 (Fla. 2006) (holding that the trial court did not abuse its discretion by allowing a medical examiner—who did not perform the subject autopsies—to testify about the cause and manner of death based, in part, on discussions with the medical examiner who did conduct the autopsies); *Univ. of Fla. Bd. of Trs. v. Stone ex rel. Stone*, 92

So. 3d 264, 272 (Fla. 1st DCA 2012); *G.V. v. Dep't of Children & Families*, 795 So. 2d 1043, 1048-49 (Fla. 3d DCA 2001).

Even if the administrative law judge did not abuse his discretion in admitting McNew's testimony, Appellant asserts that the administrative law judge should not have relied on it because McNew did not specifically state his opinion within a reasonable degree of scientific probability or certainty. However, when asked for his final opinion, McNew testified—without equivocation—that Appellant's "blasting and the vibrations created from the blasting caused this problem[,]" rendering the testimony competent evidence that the administrative law judge could consider on the issue of causation. *See Brown v. Glade & Grove Supply, Inc.*, 647 So. 2d 1033, 1036 (Fla. 4th DCA 1994); *see also Miami-Dade Cty. Sch. Bd. v. A.N., Sr.*, 905 So. 2d 203, 206 (Fla. 3d DCA 2005) ("We hold that the substance of the psychologist's testimony when considered in its entirety meets the threshold of 'reasonable probability' . . . ."); *cf. Buenoano v. State*, 527 So. 2d 194, 197-98 (Fla. 1988) ("Expert medical testimony as to the cause of death need not be stated with reasonable certainty in a homicide prosecution and is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death.").

In addition to McNew's expert testimony, the administrative law judge relied on circumstantial evidence to find a causal connection between Appellant's blasting activities and the damage to Appellee's lake. Causation can be established by both expert testimony and circumstantial evidence. *See Gant v. Lucy Ho's Bamboo Garden, Inc.*, 460 So. 2d 499 (Fla. 1st DCA 1984); *see also Brown*, 647 So. 2d at 1036. Generally, the issue of proximate causation is to be resolved by the trier of fact. *Coker v. Wal-Mart Stores, Inc.*, 642 So. 2d 774, 778 (Fla. 1st DCA 1994). A finding of causation will be sustained on appeal if it is supported by competent substantial evidence. *See State, Dep't of Children & Family Servs. v. Amora*, 944 So. 2d 431, 435-36 (Fla. 4th DCA 2006). We conclude that competent substantial evidence supports the administrative law judge's finding that Appellant's blasting activities were a contributing cause of the damage to Appellee's lake. The administrative law judge correctly concluded that this was sufficient to subject Appellant to strict liability because

11

blasting is an ultra-hazardous activity.[*] *See Poole v. Lowell Dunn Co.*, 573 So. 2d 51, 52 (Fla. 3d DCA 1990) (holding that defendant engaged in blasting activities, which the trial court found to be ultra-hazardous and subject to strict liability, was liable for the consequences of his conduct even though some other cause contributed to the same damage).

## C.

Finally, Appellant claims that the trial court erroneously rejected the expert testimony of Jeffrey Straw. The decision to accept or reject expert testimony is reviewed under an abuse of discretion standard. *Beach Cmty. Bank v. First Brownsville Co.*, 85 So. 3d 1119, 1121 (Fla. 1st DCA 2012). However, discretion in rejecting expert testimony cannot be exercised arbitrarily and requires some reasonable basis in the evidence. *Id.* The administrative law judge did not reject Straw's testimony in its entirety, but only his opinion that soil consolidation would not occur at the PPV levels likely to have occurred at the lakeshore as a result of Appellant's blasting. The administrative law judge found this testimony unpersuasive because Straw merely conveyed the opinions of the authors of scientific literature Straw had read; authoritative literature was supposed to be used on cross-examination, not to bolster Straw's opinion testimony; and Straw's testimony was inconsistent with Black's testimony that ground-borne vibrations from heavy trucks could cause soil erosion at the lakeshore. Contrary to Appellant's assertions, the administrative law judge's rejection of this testimony was not arbitrary and had some reasonable basis in the evidence.

---

[*]There is nothing in the statutory language of the Florida Construction Materials Mining Activities Administrative Recovery Act expressing an intent to modify the common law regarding strict liability for ultra-hazardous activities. Accordingly, we presume that the Act was not intended to alter that particular aspect of the common law. *See Ady v. Am. Honda Fin. Corp.*, 675 So. 2d 577, 581 (Fla. 1996) ("A court will presume that . . . a statute was not intended to alter the common law other than by what was clearly and plainly specified in the statute.").

## III.

Because Appellant failed to establish that any of the administrative law judge's rulings constituted reversible error, we affirm the final administrative order in its entirety.

AFFIRMED.

WETHERELL, J., concurs; MAKAR, J., concurs with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

MAKAR, J., concurring.

This case involves seismological liability-science, in which dueling experts tried to explain whether the heavily-regulated South Florida underground mining detonations of SDI Quarry, Inc., commenced in 2005, caused the edge of a man-made lake located over 1.25 miles away to slowly degrade about one yard landward starting six years later. I reluctantly concur because our review is confined to accepting the science and lay testimony as presented, which was not subject to scrutiny under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), leaving vast discretion as to causation in the fact-finder's hands.

South Lake is one of two man-made lakes owned by a condominium association that oversees a mobile home community known as Gateway Estates, located in Miami-Dade County, Florida. The lake—excavated sometime before 1975—is narrow and dog-bone shaped, approximately 800 feet long and between 50-120 feet wide. It lies about 200 feet south of the community's other artificial lake, which is rectangle-shaped and aptly named North Lake.

13



Since 2005, SDI Quarry conducted underground blasts no closer than 7,000 feet east of South Lake, averaging about 20 times per year. Each was closely monitored and their vibrations were recorded. All were within lawful levels established by state law (the limit is a peak particle velocity (PPV) of 0.5 inches per second); none exceeded 0.2 PPV at South Lake (most being 0.1 PPV). No damage to South Lake was evident for five to six years of blasting until 2011, when its shore first began to show signs of destabilization,[1] resulting in this litigation under Florida's Construction Materials Mining Activities Administrative Recovery Act, which provides a "specific administrative remedy" for claims of damages from explosive use in construction materials mining activities. §§ 552.32-40, Fla. Stat.

The issue of whether the detonations caused harm to South Lake's shoreline was the focal point of the proceedings. The property owners' expert—a marine construction consultant who had no training/education in seismology, geology, or related

---

[1] The record contains no reference to whether North Lake or nearby lakes, retention ponds or the like (e.g., water hazards on a golf course by the blast site) suffered a similar fate.

14

disciplines—and based his opinion on consultations with a colleague and Internet research—claimed that vibrations from the underground explosions traveled over 1.25 miles (as the mole bores), resulting in liquefaction of deep-seated muck and ultimately a weakened and eroding lake bank; he ruled out earthquakes and heavy trucks driving nearby as causes. A few property owners said they noticed damage to the lakeshore after individual blasts had occurred (though no one felt the vibrations at the time). The mining company's experts—both experienced and licensed professional engineers, one specializing in geotechnical soil conditions and the other specializing in measuring vibration in blasting, pile driving, and heavy construction—countered that the dissipated seismic energy at that distance would not cause any harm; they also pointed out that erosion of the lakeshore was likely due to rainwaters, wind, and wave action causing the bank's silt to flow downward via gravity. The blasts were all within state standards, which doesn't negate potential liability, but no generally accepted scientific standard exists as to relevant threshold PPV levels for when man-made lakeshores would be affected adversely by vibrations from afar. Scientific standards exist for buildings, but the lack of standards for artificial lake banks forced the experts to conjecture as to what levels were likely to trigger physical degradation like that at South Lake.

Given these competing narratives of scientific causation, the administrative law judge—as finder-of-fact in this category of cases—said it was a "close case" but favored the property owners' version, supplementing his legal conclusion as to causation with his "common knowledge and ordinary experience" as to how vibrations from nearby trucks compare vis-a-vis underground blasts, which he used to discredit one of the company's experts. Because no seismic standards for waterbody shores were established by the evidence, the administrative law judge resorted to "inferring" that vibration from nearby traffic on a major highway would be less than that of the blasting, again discrediting the company's expert. Notably, the property owners' expert wasn't subject to a *Daubert* objection or hearing, which might have resulted in the exclusion of portions of his testimony for lack of a scientific foundation that only experts in seismology and geotechnical soil conditions could provide. Other than the opinion testimony of the property owners' expert, no scientific evidence

15

existed that the lake banks were adversely affected by the distant underground blasts (lay testimony merely supported his testimony). But we take the case as presented, which provides no preserved basis for reversal as to causation.

The result in this case harkens back fifty years, to pre-*Daubert* days, when the federal government was sued for its sonic boom test program, which resulted in liability for seismic damage to homes near Oklahoma City. *United States v. Gravelle*, 407 F.2d 964 (10th Cir. 1969). The six-month program, consisting of 1,253 test flights at altitudes of 21,000-50,000 feet, was intended to "gain information probing the feasibility of developing supersonic commercial aircraft and the particular purpose was to measure structural response to sonic booms as well as 'determine the normal reaction of ground population over a significant period of time to sonic boom pressures.'" *Id.* at 966. On appeal, the "questions presented [were] very limited and the principal issue probe[d] the quality and quantity of evidence necessary to sustain an affirmative finding of causation of damages occasioned by the government's wilful [sic] tort." *Id.* at 965-66.[2]

Much like this case, the sonic boom trial involved the same competing narratives of causation: the (arguably) high quality/quantity of scientific evidence presented by the defense experts establishing no possibility of causation versus the (arguably) lesser quality scientific testimony of the plaintiffs' expert (overlaid with lay testimony of property owners) who opined that sonic boom vibration was the cause of the damage to their homes (most of which consisted of the "formation of new cracks; glass breakage; the reopening of old cracks which had been repaired prior to the booms; and the popping of nails in plasterboard"). *Id.* at 966.

---

[2] The three issues raised were: "1. Whether, as a matter of law, plaintiffs failed to sustain their burden of proving that sonic booms generated by Government aircraft caused damage to their properties. 2. Whether the district court's determination that the sonic booms caused the damage is clearly erroneous. 3. Assuming that the sonic booms did cause the damage, whether the district court erred in not finding that the damage caused was de minimis." *Id.* at 966.

Indeed, the federal government, in *Gravelle*, put on massive amounts of scientific evidence (the appellate court characterized it as "impressive"), but the legal standard on appeal was not who provided the highest quality and greatest quantity of scientific input; instead, the only inquiry was whether the district judge's finding of causation was "clearly erroneous." The appellate court, noting that the "quality of proof under such circumstances [sonic boom testing] can only be, and need only be, minimal," a "standard [that] was met by the experts' opinion that the subject damage, viewed in the light of the homeowners' account of their properties' history, was 'likely' caused by the sonic booms." *Id.* at 969.

Notably, the causation question was not exclusively (and perhaps predominantly) a scientifically-driven inquiry in *Gravelle*; nor was it one in this case. Given two narratives as to scientific causation, a potential tie-breaker of sorts is the non-scientific testimony of the affected property owners when used to buttress their expert. In *Gravelle*, for example, the homeowners "testified in some instances that particular items of damage occurred in front of their eyes at the instant of a boom; more often this testimony was to the effect that defects in the homes were not present in the structures before the booms and were found for the first time after the booms or worsened during the progress of the continuing program." *Id.* at 966-67. The federal government "emphatically attack[ed] both the legal competency and the value of this lay testimony to in any way probe the ultimate issue of causation." *Id.* at 967. Rejecting this argument, the appellate court said:

> Such testimony, if deemed credible, may be considered by the fact-finder as establishing a circumstance which in turn is pertinent to the issue of causation. The lay witnesses could not, of course, competently testify as to the forces that sonic booms create for such a subject requires specialized knowledge and understanding. However the desirability or need for expertise in testimony probing an ultimate fact does not preclude, as a matter of law, all other evidence for 'expert evidence does not foreclose lay testimony concerning the same matter which is within the knowledge and

17

comprehension of the lay witness.' . . . Although the judgments in the case at bar are dependent on acceptance of the testimony of the lay witnesses by both the fact-finder and the expert witnesses called by [plaintiffs], we hold that such acceptance is legally proper in both instances.

*Id.* at 967 (citations omitted).[3] Stated differently, non-scientific lay testimony that logically bolsters the testimony of the scientific expert is permissible, even if it independently lacks a scientific basis.

Applied here, the administrative law judge had broad discretion to construct a conclusion as to causation. He could have sided with the company, concluding that its experts were more credible and that no causation was proven; he could have sided with the property owners' expert, concluding that causation was proven; or he could have made variegated findings (as he did, siding with each side's experts and evidence to some extent) and found or denied causation; he also could have found that the blasting was one of a number of man-made and natural factors (e.g., tropical storms and hurricanes) that contributed to causing the property damage (as he did) and decided that it was significant or not. Different administrative law judges could reach different conclusions. On this record, limited by no *Daubert* review, most any finding as to causation or lack thereof would be deemed legally

---

[3] The court in *Gravelle*, much like the administrative law judge here, injected a dose of "common knowledge" in rejecting the defendant's experts. In *Gravelle*, the experts pointed out that "the threshold of human irritation from auditory and motion stimuli is much lower than the irritability threshold for structures," such that homeowners experiencing sonic booms might think their homes were "about to fall apart, when in fact no structural damage was occurring" particularly because they were "forewarned, as here, of the occurrence of sonic booms and the expressed willingness of the government to pay for resultant damages, if any." 407 F.2d at 967. Though finding the premise of this point "to be indisputable as a matter of common knowledge," the court nonetheless deemed it a credibility issue for jurors, rather than an appellate court, to adjudge. *Id.*

supportable under appellate review; the administrative law judge said as much, noting that "there is competent, substantial evidence on both sides."

Some people will deem it scientifically far-fetched to believe that lawful underground blasting in the range of 0.1 to 0.2 PPV over 1.25 miles away caused a man-made lake to gradually degrade over a decade for which $840,000 in compensation is owed; others will see it as entirely possible, and the damage award as a just result for an ultra-hazardous activity. Some will decry reliance on testimony by property owners that blasting was coincident with their damages, citing self-interest and bad science; others will applaud that such testimony and the administrative law judge's reliance on "common knowledge and ordinary experience" provide a necessary dose of reality to counter lifeless scientific data that lacks context. A skeptical few might go so far as to say that a Magic-8 Ball would be just as accurate in deciding causation, perhaps justifying greater scientific standards or a court-appointed expert to assist the judges. *See, e.g.*, Rule 706, Fed. R. Evid. (2018) ("Court Appointed Expert Witnesses"). Such is the current state of debate about causation and seismological liability-science, which hasn't changed much in fifty years.

_____

Diane H. Tutt of Conroy Simberg, Hollywood, for Appellant.

Dale C. Glassford of Dale C. Glassford, P.A., Miami, for Appellee.